## LAPP v. PENNSYLVANIA R. CO.

### No. 4544.

Circuit Court of Appeals, Third Circuit.
July 17, 1931.

Coult, Satz & Tomlinson, of Newark, N. J. (De Voe Tomlinson, of Newark, N. J., of counsel), for appellant.

John A. Hartpence, of Jersey City, N. J., for respondent.

Before WOOLLEY, DAVIS, and THOMPSON, Circuit Judges.

THOMPSON, Circuit Judge.

This is an appeal from a judgment of nonsuit entered in a suit by the plaintiff to recover damages for the death of her husband alleged to have been caused by the negligence of the defendant. The accident occurred on a dark night in the North River near Hoboken, N. J. The decedent, Harold Lapp, was employed as a seaman by the defendant and his duties were in connection with the transfer, by means of a tug, of car-floats of the defendant from one dock to another. On the night in question, the decedent was acting mate on the tug and the service to be performed by the tug was to push a car-float loaded with cars into a slip and then to pull out another car-float also loaded

with cars, which was to be towed to another slip.

There was testimony showing that Lapp went aboard the float, which was to be taken out, for the purpose of seeing that the lines tying it up to the dock were cast off before the tug commenced to back out with the float. The tug was made fast at its bow to the outgoing float and, after the float had started to move, a scream was heard and, when search was made, the decedent's cap was found floating in the water and later his dead body was recovered.

There was proof, under objection, of a custom among the employees of the defendant that the tug should not start to pull upon the outgoing float until the mate (in this instance, Lapp) on board the outgoing float, after the lines attaching the float to the dock had been thrown off, gave a signal by calling to those on the tug, "She is all gone," and by blowing two whistles, thereby indicating that the float had been loosed and was ready to be moved.

As the plaintiff's case developed at the trial, the only ground set up in the complaint charging negligence on the part of the defendant, supported by the evidence, was violation of the custom in that the float was moved by the tug without first receiving a signal or other notice from Lapp that it was safe and proper to shift or move it.

The testimony of the plaintiff's witness Ryan, an employee of the defendant, was to the effect that he was on duty on the float lying to the right of the one that was to be pulled out; that his duty was to take a line and stand on the float until the tug came back; that, while he was doing this, Lapp was on the float which was to be pulled out. He testified that the float started to come back, got about thirty feet back toward the river, out from the shore.

"It got about thirty feet back and I heard a scream and the float stopped, and I started to walk up toward the tug. * * *

"The corner of the float hit something going out and give like a lurch, like when two boats come together, they banged together going out, shoved the float.

"Q. Now, was that before you heard the scream or after you heard the scream? A. Well, it hit several times before I heard the scream.

"Q. And what sort of a lurch was it, a slight lurch or a heavy lurch? A. Heavy."

The trial judge, after considerable discussion, sustained an objection to proof of the custom, in view of the testimony of the witness that the float was moving back and had already moved about thirty feet when the scream was heard.

It appears from the record that the attorney for the plaintiff, during recess of the court, asked the witness about the length of time that elapsed between the time the float left the dock and the time of the scream, and that the witness voluntarily stated to him that he had been misunderstood about the thirty feet, and that what he had meant to say was that the barge had moved thirty feet before it was stopped.

After this conversation with the plaintiff's attorney and after recess when the witness was again put upon the stand, he was asked as follows:

"Q. How do you wish to clarify it now? A. The boat stopped at about thirty feet out. I heard the scream before that, before the float stopped."

Finally, upon being asked by the trial judge whether he wanted to change his testimony, he said:

"I would say I heard the scream as soon as the float started out, within one or two seconds after.

"Q. Then you want to change your testimony? A. Yes, sir."

The witness was then permitted to testify as follows:

"The Court: What was done with respect to these warnings? What warnings were given and when, for how long and in whose presence? A. When the boat comes in to get a float or barge or anything out, the mate or floatman goes out on the float, lets all the lines go, and if they are going to shift the float, the mate generally stays out there. If they are going to pick it up, he goes back on the boat. The floatman lets it go and hollers 'She is all gone.' When they are going to shift it, the mate stays out there and he hollers, 'It's all gone.' He blows two whistles to come back or go ahead, whatever he wants done."

Being further questioned by the court, he testified as follows:

"Q. Who does give the signal? A. The man that is out there gives the signal to the tug or barge. He signals to the tug, it is all right to take it away.

"Q. In this particular case, was there anybody on the float besides Mr. Lapp? A. The last time I saw him, the other floatman was on the float, too.

"Q. What is his name? A. His name was Collins.

"Q. Was he the man who was supposed to give the signal? A. Why, no. When the mate is out there he gives the signal.

"Q. Who was the mate? A. Harold Lapp was the mate.

"Q. Then the man himself was supposed to have given the signal; is that it? A. Yes, sir."

Upon the point whether he heard any signal given by Lapp, he testified as follows, under questioning by the court:

"Q. What did you hear other than the scream of Mr. Lapp that evening, if anything? A. Well, the only thing I heard was the bells of the tug. The captain of the tug gives a signal to the engineer to come back. I heard the bells of the tug. I heard the scraping of the float, and then the float stopped and I knew something happened and I started to walk up to see what happened.

"Q. Were the bells any louder than the whistle or less loud? A. I know the whistle is louder outside.

"Q. How far away from the boat where Mr. Lapp was were you, how many feet? A. Well, if he was where I think he was, I was 50 feet away from him.

"Q. And you heard the bells? A. I heard the bells when the tug was about 100 feet away.

"Q. Well, the bells would mean to you, wouldn't they, that she was going ahead? A. It would mean it was going back.

"Q. Pushing the float. You mean the bells were to push the float on or to push it back? A. Well, you can hear the bells. You know they are going to move. You don't know what they are going to do but you can hear them. You can hear the bell on the tug."

It was within the proper discretion of the trial judge to admit the testimony of Ryan, contradicting or changing his testimony concerning the distance the float had been towed before the scream was heard, so that the case would properly have gone to the jury if the changed testimony, together with the testimony of custom, was sufficient to establish negligence on the part of the defendant.

It is contended, however, on behalf of the defendant that, even with the changed testimony before the jury, it was not sufficiently established by the evidence either that Lapp's death was caused by the premature starting of the tug, or that no signal was given by Lapp to the men on the tug.

We think that on either of these contentions the trial judge did not err in entering a nonsuit. No one saw Lapp fall overboard. Ryan, the only witness called to show how the accident occurred, was on the other float, and his estimate of the distance between Lapp and himself, when the tug started back with the float, was based entirely on where he thought Lapp was. He testified that he heard no signal, not that no signal was given. He testified that there was ice on the deck between the cars upon the float and its side.

The jury could not determine from his testimony how the decedent came to his death, excepting through mere guess and speculation. They might guess that he fell overboard because of the premature start of the float, or because he slipped on the ice, or because of a jar from striking another float. The evidence does not show that the signal under the custom had any purpose except to indicate that the lines had been cast off. Among those several theories, there was no sufficient evidence upon which they could reach a definite conclusion concerning the cause of his death.

A verdict based upon mere speculation and theories not supported by the evidence cannot be allowed to stand. This court has so held in a number of cases. Reading Co. v. Boyer, 6 F.(2d) 185; Phila. & Reading Ry. Co. v. Bartsch, 9 F.(2d) 858; Dobbyn v. Boat Repairing Corporation, 25 F.(2d) 283; Szczepanski v. Penna. R. R. Co., 36 F.(2d) 1022. See, also, N. Y. C. R. Co. v. Ambrose, 280 U. S. 486, 50 S. Ct. 198, 74 L. Ed. 562.

The judgment is affirmed.